IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES G., JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 18-cv-4794 |
| v. | ) |
| | ) Magistrate Judge Susan E. Cox |
| ANDREW M. SAUL, Commissioner of the | ) |
| Social Security Administration[1], | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff James G., Jr. ("Plaintiff")[2] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his disability insurance benefits under sections 216(i) and 223(d) of the Social Security Act through March 31, 2017, the last date insured. The Parties have filed cross motions for summary judgment. For the reasons detailed below, the Commissioner's Motion for Summary Judgment (dkt. 23) is granted, Plaintiff's motion (dkt. 12) is denied, and the Administrative Law Judge's decision is affirmed.

**I. Background**

    **a. Factual Background and Procedural History**

Plaintiff alleges an inability to work due to pain in his lower back and legs resulting from two workplace injuries. (R. 195-99.) Although Plaintiff fully recovered from the first injury occurring in 2008 – which required in an L5-S1 fusion – he was reinjured in 2012. (R. 286, 361.) Plaintiff, a 35-year-old delivery truck driver for a beverage company, injured his back for the second time on January 4, 2012; while attempting to bounce a 250-pound handcart up a flight of stairs, Plaintiff felt a pop

---

[1] As of June 4, 2019, Andrew M. Saul is the Commissioner of the Social Security Administration. Pursuant to Federal Rule Civil Procedure 25(d), he is hereby substituted as Defendant.

[2] In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

with sharp pain to his lower back. (R. 459, 671.) After treatments of injections, pain medications, and physical therapy, Plaintiff's treating physicians and physical therapists released him to light and medium work consistent with an FCE performed in 2013. (R. 295, 685.) However, State agency doctors recommended restricting Plaintiff to sedentary work while noting "subjective complaints of back pain" and that Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not substantiated by the objective medical evidence alone. (R. 66, 70, 79.)

In February of 2013, Dr. Daniel A. Troy deemed Plaintiff to have reached a medium-to-heavy physical demand level from a functional standpoint. (R. 337.) Several months later Frank Berardi OTR revealed Plaintiff's ability to perform light to medium work, with several lifting and postural restrictions including no lifting or carrying weight greater than 30 pounds on an occasional basis. (R. 355.) On May 7, 2013, Plaintiff reported chronic numbness in the left leg related to his previous back surgery performed in 2008. (R. 398-399.)

In August 2014, orthopedic notes from Dr. Troy indicate Plaintiff was continuing to have chronic pain with radiation to his right leg. (R. 286) Imaging revealed degeneration of the lumbosacral discs consistent with status post L5-S1 fusion in 2008. (R. 287.) Gabapentin and Norco were prescribed for pain. (*Id.*)

On November 4, 2014, Plaintiff reported an acute exacerbation of his chronic back pain. (R. 410.) On November 9, 2014, examination revealed tenderness from L1 to L5, limited range of motion, decreased sensation over the lateral aspect of his bilateral legs, muscle spasm bilaterally in the paraspinous muscles, and a positive straight leg raising test. (R. 333-34.) Gabapentin and Norco were again prescribed, and Plaintiff was scheduled for an epidural injection. (*Id.*)[3] On November 20, 2014, an MRI and CT scan of Plaintiff's lumbar spine revealed Grade 1 anteriolisthesis of L5 on S1 with postsurgical changes, moderate circumferential osteophytes resulting in mild to moderate

---

[3] The injection was administered on February 8, 2015. (R. 339.)

bilateral neuroforaminal narrowing, and mild degenerative changes elsewhere within the lumbar spine. (R. 342.)

In December 2014, an orthopedic examination by Dr. Nicholas Angelopoulos noted a moderate antalgic gait and moderate limp while walking, muscle spasm bilaterally in the paraspinous muscles, restricted lumbar range of motion, 4/5 muscle strength in the lower left extremity, and a positive straight-leg raising test bilaterally. (R. 654.) During this examination, Plaintiff also revealed a history of a right knee ligament repair and a family history of osteoporosis. (R. 653.)

In May of 2015, Plaintiff visited Dr. Alexander Ghanayem. (R. 672.) According to Dr. Ghanayem's examination, Plaintiff had subjective complaints of bilateral leg pain in multiple nerve distributions including L3, L4, L5, and S1 "in the context of a fusion that is radiographically stable at L5-S1, and no evidence of any adjacent level problems." (*Id.*) Additionally, Dr. Ghanayem noted that "there is no objective structural loss of integrity in his lumber spine looking at the postoperative MRI scan" and that "the new onset of leg symptoms is not substantiated by objective testing." (*Id.*) Dr. Ghanayem concluded his note recommending that Plaintiff "should return back to work at his pre-January 4, 2012 work status" and that "a brief course of physical therapy on the order of six to eight weeks would have been medically reasonable for the work injury as described." (*Id.*)

In July 2015, Plaintiff underwent a physical consultative examination with Dr. Kimberly Middleton, a family medicine practitioner. (R. 452-56.) The examination was based upon Dr. Middleton's brief examination and a review of Dr. Troy's treatment notes from August 30, 2014. (R. 452.) Plaintiff presented with pain upon palpation along the paraspinal musculature bilaterally throughout the lumbar spine, spasms along the L4-S1 distribution, tenderness with palpation of the right S1 joint, and positive straight leg raising in both the sitting and supine position on the right. (R. 453-55.) He exhibited decreased tactile sensation along the "L5" distribution on the right, decreased tactile sensation along the left thigh, leg, and foot, and decreased flexion and pain with

bilateral rotation and extension of the lumbar spine. (*Id.*)

Treatment notes from June 2016 through May 2017 from Karuna Sachdeva, PA and Dr. Joel See, MD indicate that Plaintiff displayed a moderate antalgic gait, and that he had reported pain with forward flexion and extension of the lumbar spine and positive tenderness to palpation over the paraspinals. (R. 688, 694, 700, 704, 709, 714, 719.) On June 15, lumbar x-rays revealed mild bilateral perineural fibrosis involving the traversing bilateral S1 nerve roots and mild to moderate multilevel facet osteoarthritis of the mid to lower lumbar spine. (R. 729.)

Plaintiff was seen eight times by his treating pain management physician, Dr. Joel See, from September 6, 2016 through May 30, 2017. (R. 692-736.) On October 7, 2016, Dr. See noted that the MRI taken on June 15, 2016 showed no significant disc or facet abnormality, spinal stenuosis, or foraminal narrowing on L1-L2 or L2-L3, however there was mild to moderate bilateral facet arthropathy with ligamentum flavum thickening and facet hypertrophy from L4-L5 with no significant disc disease and no significant stenuosis. (R. 729.) In Plaintiff's L5-S1, Dr. See notes evidence of a posterior hardware fusion with bilateral laminectomies and interbody fusion with a grade 1 anterolisthesis of approximately 6 millimeters with mild enhancing granulation tissue or fibrosis extending into the subarticular zones with suspicion for mild bilateral perineural fibrosis. (*Id.*)[4] On November 7, 2016, Plaintiff reported "having functional improvement on the pain medications." (R. 721.) On December 7, 2016, Plaintiff received ultrasound guided trigger point injections with a solution containing "6 cc of 1% Lidocaine and 1 cc of Depo-Medrol 40 mg per mL + 60 mg Toradol." (R. 719.) Dr. See noted that Plaintiff "tolerated the procedure well and reported some immediate pain relief." (R. 720.) On February 1, 2017, Plaintiff reported that the trigger point injection was not very helpful. (R. 711.) Plaintiff also presented with "new complaints of pain and

---

[4] This note of a posterior hardware fusion and interbody fusion at L5-S1 is consistent with Plaintiff's previous back surgery in 2008. (R. 729.)

4

numbness in the left hand." (*Id.*) However, Plaintiff did note that "he is taking the pain medication with some improvement." (*Id.*) On March 1, 2017, Plaintiff reported that "he does get adequate analgesia, and he has the ability to comfortably perform his activities of daily living." (R. 710.) Additionally, Dr. See ordered a diagnostic testing nerve conduction study and EMG from his clinic. (*Id.*) On April 3, 2017, Dr. See noted that Plaintiff's EMG and nerve conduction study of the upper extremities "is significant for moderate to severe carpal tunnel on the right and mild on the left" after demonstrating no signs of physical discomfort during testing conducted in 2013. (R. 372-75, 705.) Further, Plaintiff reported "having improvement of his backpain" with his prescribed medications, which were then refilled by Dr. See. (*Id.*) On May 1, 2017, Plaintiff reported that he was "having functional improvement with activities on the pain medication." (R. 697.) On May 30, 2017, Plaintiff followed-up with Dr. See after he had received a right hand carpal tunnel injection 2 weeks prior from Dr. Cohen. (R. 692.) Plaintiff reported good pain relief in that area and conveyed that surgery was being discussed. (*Id.*) Additionally, Plaintiff reported that he continues taking the prescribed pain medication for back and leg pain "with improvement." (*Id.*)

Plaintiff alleged irritability, impaired sleep patterns, and "feeling down all the time" to State consultative psychological examiner Kathryn Murphy, Psy.D. (R. 449.) He had been diagnosed with depression in approximately 1999, but his symptoms returned after his second back injury. (R. 447.) In July 2015, a State consultative psychological examiner concluded that Plaintiff "endorsed symptoms of Unspecified Depressive Disorder." (R. 449.)

Plaintiff field a Title II application for a period of disability and disability insurance benefits on October 29, 2014 alleging disability beginning January 4, 2012. (R. 13.) Initially, the claim was denied on August 26, 2015 and then upon reconsideration on December 4, 2015. (*Id.*) Plaintiff filed a written request for hearing in front of an Administrative Law Judge ("ALJ"), which took place on July 31, 2017 in Orland Park, Illinois. (*Id.*) The ALJ issued a written opinion on September 8, 2017,

finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act through March 31, 2017, the last date insured. (R. 13-23.) On May 9, 2018, the Appeals Council denied review, thus making the ALJ's decision the final decision of the agency, and vesting the Court with jurisdiction to hear this appeal. (dkt. 13 at 1.)

### b. The ALJ's Decision

The ALJ, William Spalo, issued a written decision on January 9, 2017. (R. 13-23.) The ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from January 4, 2012, the alleged onset date, through March 31, 2017, the date last insured. (R. 23.) At step one,[5] the ALJ found Plaintiff had not engaged in substantial gainful activity since the date of alleged onset, January 4, 2012. (R. 15.) At step two, the ALJ concluded that Plaintiff had the severe impairments of degenerative disc disease of the lumbar, spine status post fusion, and a recent diagnosis of carpal tunnel syndrome. (*Id.*) The ALJ noted that although the Plaintiff's severe impairments caused more than a minimal impact on his ability to perform work-related activities, his medically determinable mental impairments of depression and anxiety did not cause more than a minimal limitation on his ability to perform basic mental work activities. (*Id.*) Thus, they were non-severe. (*Id.*) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17.)

For the Disability Period, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 404.1567(a) except that he could never climb ladders, ropes, or scaffolds, could only occasionally balance, stoop, kneel, crouch, crawl, and climb stairs or ramps. (R. 18.) Additionally, the ALJ found that Plaintiff could frequently handle and finger, bilaterally, although he should avoid concentrated exposure to extreme cold and humidity.

---

[5] *See infra* § II for a discussion of the five-step analysis in Social Security cases.

(*Id.*) At step four, the ALJ further found that Plaintiff was unable to perform any past relevant work through the date last insured. (R. 22.) The ALJ noted that although the vocational expert testified that the Plaintiff had past worked as a delivery truck driver, which is semi-skilled and generally performed at the medium exertional level, Plaintiff described performing his role at the heavy exertional level. (R. 22.) Because of Plaintiff's residual functional capacity assessment, the ALJ concluded that Plaintiff was unable to perform past relevant work. (*Id.*) At step five, the ALJ determined that, considering the Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed through the date last insured. (*Id.*) Therefore, the Plaintiff was not disabled at any time from the alleged onset date through the date last insured. (R. 23.) According to the ALJ and based on the testimony of the vocational expert, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (*Id.*)

## II. Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage

in another type of work existing in a significant number of jobs in the national economy. *Id*. At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show there are significant jobs available that the claimant is able to perform. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). Even where "reasonable minds could differ" or an alternative position is also supported by substantial evidence, the ALJ's judgment must be affirmed if supported by substantial evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Scheck*, 357 F.3d at 699. On the other hand, the Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535,539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

### III. Discussion

Plaintiff makes six arguments in support of his motion. The Court will address the arguments

separately to maintain consistency with the presentation of Plaintiff's arguments in his brief. Because the Court finds the ALJ properly considered Plaintiff's reported symptoms, the Court rejects each of Plaintiff's arguments and denies his motion, as discussed below.

### A. The ALJ Properly Found that Plaintiff's Back Impairments Do Not Meet or Equal Listing Level Severity

According to Plaintiff, the ALJ erred in concluding that Plaintiff's back impairments do not meet or exceed listing level severity. Plaintiff argues that the ALJ unduly focused on the lack of findings that Plaintiff is unable to ambulate. (dkt. 13 at 7.) However, the ALJ explicitly considered both Listing 1.02 and 1.04 when making his decision. (R. 17-18.) Listing 1.02 includes the major dysfunction of a joint due to any cause and characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint with either involvement of one major peripheral weight-bearing joint. (R. 17.) This must also result in either: (a) the inability to ambulate effectively or (b) the involvement of one major peripheral joint in each upper extremity resulting in the inability to perform fine and gross movements effectively. (*Id.*)

The ALJ's opinion demonstrated his consideration of the aforementioned criteria. The ALJ recognized that the documented physical examinations of the claimant "do not show that he is unable to ambulate or perform fine and gross movements effectively." (R. 17.) Additionally, the ALJ emphasized that further explanation is "indicated in further detail below." (*Id.*) Although the record does indicate Plaintiff may have a degenerative disc disease that may result in the compromise of a nerve root, Plaintiff does not fulfill the entirety of the criteria needed to meet the requirement of Listing 1.02. (dkt. 13 at 7.) Plaintiff fails to allege, and the record fails to reflect, that this degenerative disc disease has resulted in Plaintiff's inability to ambulate effectively (Listing 1.02(b)) or that it has resulted in the involvement of one major peripheral joint in each upper extremity, resulting in the

inability to perform fine and gross movements effectively (Listing 1.02(c)). (R. 17.)

The ALJ also considered Listing 1.04, which addresses disorders of the spine, when making his decision. (R. 18.) Listing 1.04 states: "Disorders of the spine (*e.g.*, herniated nucleus puposus, spinal arachnoiditis, spinal senosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

   A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion with the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
   B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dyesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
   C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively as defined in 1.00B2b."

20 C.F.R. § 404, Subpt. P, App. 1. Although Plaintiff alleges the ALJ "did not mention or refer to any of the medical evidence in reaching his Step 3 finding", as stated above, the ALJ highlighted that further detail relevant to this decision would be available later in his opinion. (R. 17.) The relevant information pertaining to claims related to Listing 1.04 can be found later in this opinion.[6] The ALJ acknowledged that Plaintiff had asserted physical limitations related to his having to alternate between sitting and standing "every 15 minutes." (*Id.*) Further, the ALJ recognized that Plaintiff has claimed that he can only lift or carry up to 10 pounds and must lay down and "put his feet up" 3-7 times a day for 20-30 minutes at a time. (*Id.*) Lastly, two State agency doctors reviewed this same evidence, explicitly considered Listing 1.04, and reached the same conclusion as the ALJ. (R. 66, 79.) No doctor within the entirety of the record opined that Plaintiff met or equaled Listing 1.04. (*See,*

---

6   *See infra* § III D.

R. 337-38, 346-52, 355-58, 452-57.) The Court declines to remand on this basis.

### B. The ALJ Properly Accounted for Plaintiff's Mental Limitations in the RFC Assessment

Next, Plaintiff argues the ALJ's decision failed to accommodate any mental limitations in his RFC assessment. (dkt. 13 at 8.) However, the ALJ cited much evidence regarding the four areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). (R. 18.) Further, Plaintiff contends the ALJ's argument that the State Agency psychological consultant is an expert in disability claims was uncompelling – even though that opinion is consistent with the evidence of the record. (dkt. 13 at 8-9, R. 16.)

Throughout his analysis, the ALJ assessed no more than mild limitation in the four domains of functioning: understanding, remembering, or applying information; interacting with others; concentrating persisting, or maintaining pace; and adapting or managing oneself. (R. 16-17.) A finding of mild limitation shows that "functioning in this area is independently, appropriately, effectively, and on a sustained basis is slightly limited." 20 CFR Part 404, Subpart P, Appendix 1, § 12.00F(2)(b). The Court finds no error in the ALJ's consideration of this evidence. The Seventh Circuit has recognized that "a mild, or even a moderate, limitation in an area of mental functioning does not prevent an individual from functioning satisfactorily." *Sawyer v. Colvin*, 512 F. App'x 603, 611 (7th Cir. 2013) (signals and citations omitted).

As to Plaintiff's ability to understand, remember, or apply information, the ALJ concluded that Plaintiff is "no more than mildly" limited. (R. 16.) The ALJ accurately illustrates that Plaintiff has routinely demonstrated normal judgment, insight, and knowledge, is able to answer all questions appropriately during treatment, and spoke in logical and coherent sentences at the time of his psychological consultative examination. (R. 16.) The ALJ cited *much* evidence on this point. *See* R. 311 ("very pleasant 38-year-old"); 313 ("awake and alert"; normal judgement and insight,

11

immediate, recent, and remote memory seem normal; Language "intact for receptive and expressive functions"; Fund of knowledge "within normal limits for age and educational background"; Mood and affect "within normal limits for age and educational background"); 654 (same); 447 ("stated that he understood the reason for the evaluation"); 453 ("appears to be in no acute distress"; "pleasant and cooperative"); 694 ("General appearance is no acute distress. Cooperative, pleasant. Alert, normal mental status. Answers all questions appropriately"; "Good eye contact").

The ALJ found that Plaintiff exhibited no more than a mild limitation in his ability to interact with others. (R. 16.) In this analysis, the ALJ cited to evidence that Plaintiff generally presents with a mood and affect that is normal and appropriate to the situation and demonstrates intact language for receptive and expressive functions. (R. 16, 313, 654.) Further, at the time of Plaintiff's psychological consultative examination conducted by Dr. Katherine Murphy, Plaintiff spoke with an unremarkable speech pattern as he spoke in logical and coherent sentences. (R. 16, 448.) During another evaluation, physical consultative examiner, Dr. Kimberly Middleton, noted that Plaintiff was able to follow commands appropriately and demonstrated intact comprehension, insight, and judgment. (R. 16, 453.) The ALJ also considered treatment notes stating that Plaintiff routinely presents as pleasant and cooperative with a normal mood and affect. (R. 695-736.) Lastly, Plaintiff reported that he spends time with others, has no difficulties getting along with others, and has never been fired or laid off from a job due to problems getting along with other people. (R. 16.)

As to Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ determined Plaintiff was no more than mildly limited. (R. 17.) In his finding, the ALJ considered notes from Plaintiff's psychological consultative examination illustrating that Plaintiff's memory and attention were primarily intact as Plaintiff was able to "recall all three number sequences forward and one number sequence backward, recall the last four president[s], his breakfast the day prior, and successfully perform serial 7s." (*Id.*) Additionally, Plaintiff was able to identify both similarities and differences

12

between words. (R. 17, 448.) Plaintiff alleges the ALJ contradicted himself when addressing Plaintiff's ability to handle money and "somewhat" handle money. However, Plaintiff created the contradiction stating that he can "somewhat" manage his own funds because "[he's] pretty bad with money" on July 11, 2015 and then responding "Yes" to his ability to pay bills, count change, handle a savings account, and use a checkbook/money orders on October 25, 2015. (dkt. 13 at 9, R. 245, 447.) The ALJ also noted that the physical consultative examiner, Dr. Middleton, noted that Plaintiff was in fact oriented to person, place, and time and exhibited an intact recent and remote memory. (R. 16-17, 456.) Plaintiff also reported that he is able to go out alone, handle his own finances, drive, and follow written and spoken directions. (R. 241-52.) State agency psychologist Dr. Joseph Mehr found no severe mental impairments and noted that Plaintiff experienced distress primarily from his physical impairments. (R. 65-66.) State agency psychologist Dr. Russell Taylor arrived at the same conclusion three months later. (R. 77-79.) Neither consultative psychologist Dr. Kathryn Murphy nor any other doctor suggested that Plaintiff had deficiencies in his ability to remain on task for long periods of time as Plaintiff alleges. (dkt. 13 at 9-10, R. 449.)

The ALJ found that no more than a mild limitation exists regarding Plaintiff's ability to adapt or manage oneself. (R. 17.) The ALJ cited to Plaintiff presenting appropriately dressed and neatly groomed and his ability to drive and go out alone. (R. 17, 456.) Further, Plaintiff indicated he is able to independently care for his personal hygiene needs and is capable of handling stress and changes in routine with no noted difficulties. (R. 17, 248.)

The Court finds no error in the ALJ's consideration of this evidence or his reasoning. Here, Plaintiff points to no evidence that he had any work related mental limitation other than his own endorsements of irritability, impaired sleep patterns, and feeling down. (Dkt. 13 at 9.) Further, no doctor opined that Plaintiff experienced any mental limitations on his ability to work. For the reasons aforementioned, the Court rejects Plaintiff's argument that the ALJ failed to account for Plaintiff's

13

mental limitations.

### C. The ALJ's Allowance of Frequent Handling and Fingering in the RFC Assessment is Consistent with the Evidence

Plaintiff contests the ALJ's allowance of frequent handling and fingering as it failed to accommodate his alleged carpal tunnel syndrome. (dkt. 13 at 10.) Nowhere in the record does it state Plaintiff is in any way limited in his abilities to handle and finger, however, the ALJ provided deference to Plaintiff's pain complaints and limited him to frequent handling and fingering. The ALJ next observed that Plaintiff showed no symptoms of carpal tunnel syndrome or hand pain from the alleged date of onset through the date of last insured. (R. 21.) In July 2015, Plaintiff exhibited no signs of edema, gross deficits, or atrophy and could move all digits with a full range of motion. (*Id.*) Further, he demonstrated normal fine and gross coordination of the hands, normal pinch strength, and 5/5 grip and motor strength bilaterally. (*Id.*)

In March 2017, the final month of his date of last insured, Plaintiff presented with "new complaints of numbness and pain in his hands" and was treated for "severe" carpal tunnel syndrome on the right. (*Id.*) The record further indicates Plaintiff managed to control this pain from his carpal tunnel with medication (*Id.*)[7] The ALJ acknowledged there is insufficient evidence to establish whether Plaintiff's carpal tunnel syndrome has lasted or is expected to last for a period of 12 consecutive months, however, the ALJ has granted deference to his pain complaints and has limited Plaintiff's handling and fingering to frequent. (*Id.*) The ALJ also noted that during Plaintiff's hearing, Plaintiff acknowledged he is able to play video games, drive, water his flowers and garden, and cook some meals, which is why, along with a lack of objective evidence of more restricted hand limitations, the ALJ reached this decision. (*Id.*) Even though the VE testified that if an individual is limited to

---

[7] By May 1, 2017, Plaintiff reported functional improvements with medications and had no difficulties with fine tasks (R. 698-700); on May 30, 2017, Plaintiff reported "good pain relief" in his carpal tunnel syndrome with injections and had no difficulties with fine tasks (R. 692, 694-95.)

occasional handling and fingering at the sedentary exertion level there are no available unskilled jobs, because of these aforementioned reasons, the Court rejects Plaintiff's argument that the ALJ incorrectly allowed for frequent handling and fingering. (R. 55.)

### D. The ALJ's Finding that the Evidence Does Not Support Plaintiff's Complaints of Pain and Physical Limitation is Explained and Supported

Plaintiff asserts that the ALJ failed to perceive "objective clinical findings to support Plaintiff's claims of limitation from pain."[8] (dkt. 13 at 11.) Plaintiff argues the ALJ engaged in "rampant cherry picking, emphasizing sporadic benign and somewhat irrelevant findings, as well as mischaracterizing the evidence." (*Id.*) Under the Social Security Regulations, the ALJ undertakes a two-step process in evaluating a claimant's symptoms and subjective complaints about the severity and nature of the relevant impairments. First, the ALJ must determine whether the claimant has a medically determinable impairment that "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a). Second, the ALJ evaluates the intensity and persistence of the claimant's symptoms to determine how those symptoms limit the capacity for work. 20 C.F.R. § 404.1519(c). The ALJ's assessment on this issue will only be disturbed if it is "patently wrong." *Taylor v. Berryhill*, 2018 WL 5249234, at *6 (N.D. Ill. Oct. 22, 2018). The Court deems these allegations as false for the reasons set forth below.

Although it is true the ALJ must weigh all evidence that support a conclusion of disability while not ignoring related evidence that undermines that conclusion, no such ignoring occurred in the present matter. *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014). The ALJ is not required to discuss every piece of evidence, but instead must build a logical bridge from the evidence to his conclusion. *Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009). As the ALJ properly identified

---

[8] Objective medical findings include: Plaintiff being deemed to have reached maximum medical improvement in 2013 (R. 337); in 2013, Plaintiff was found to qualify for Light to Medium level work with restrictions (R. 355); in May 2015, Plaintiff was recommended to return back to work at his pre-January 4, 2012 work status and "[g]iven the nonorganic physical exam findings, a spinal cord stimulator and/or additional surgery is not indicated" (R. 672.)

Plaintiff's complaints and explained how he arrived at his conclusion, Plaintiff's argument is not accepted.

The ALJ acknowledged Plaintiff's history of chronic lower back pain, for which he has ongoing treatment including physical therapy, injections, and pain medications. (R. 21.) Additionally, the ALJ noted Plaintiff's ongoing complaints of pain and physical limitations but addressed that the objective and radiologic findings do not support the degree and severity of his alleged limits. (*Id.*) Further, the ALJ noted Plaintiff's claims that he can only sit for 15 minutes, walk for 10-15 minutes, and that he must lay down and put his feet up 3-7 times per day for 20-30 minutes at a time. (*Id.*) The ALJ recorded that while Plaintiff has demonstrated pain with range of motion of his lumbar spine, tenderness and spasm over his lumbar area, and some reduction in the strength of his lower extremity, he has also "demonstrated a normal, but slow, gait, no antalgia, ataxia, shuffling, or steppage gait, no need for the use of an assistive device, his recent straight leg tests have been negative bilaterally" and that recent lumbar x-rays "have shown evidence of mild bilateral perineural fibrosis involving the traversing bilateral S1 nerve roots and mild to moderate multilevel face osteoarthritis of the mid to lower lumbar spine." (*Id.*) Plaintiff, however, has indicated that he did not require assistance with any activities and he acknowledged functional improvement with pain medication.[9] (*Id.*)

The ALJ accorded great weight to the opinion of the State agency medical consultant, Dr. Richard Bilinsky, "who opined that the claimant should be limited to lifting/carrying up to 10 pounds occasionally and less than 10 pounds frequently, stand/walk 2 hours in an 8-hour workday, and sit for 6 hours." (*Id.*) The ALJ also specified the objective examination findings supporting his conclusions that are documented by the record including pain with palpation in the lumbar paraspinal muscles, spasms in the lumbar area, a positive straight leg raise test, and slow but normal gait. (*Id.*) Further,

---

[9] On June 6, 2016, Plaintiff indicated that he required no assistance with any activities. (R. 686.) On May 30, 2017, Plaintiff reported good pain relief in the hand area and is taking the pain medications "with improvement" along with gabapentin and occasional ibuprofen. (R. 692.)

Dr. Bilinsky referred to "orthopedic notes showing no neurologic deficits, normal motor strength, and some sensory changes." (*Id.*) The ALJ concluded that, as there is no treating source opinion identifying more restrictive limitations than those assessed by Dr. Bilinsky, his opinions were appropriate. (R. 22.) Thus, the Court rejects this aspect of Plaintiff's argument as well.

### E. The ALJ Fully Developed the Record

Plaintiff asserts that the ALJ violated his duty to build a complete record. (R. 12.) The ALJ "has a duty to fully develop the record before drawing any conclusions…and must adequately articulate his analysis so that we can follow his reasoning." *McFarland v. Berryhill*, 2017 WL 4122739, at *4 (N.D. Ill. Sept. 18, 2017) (citing *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005)). The Court rejects this assertion for two reasons. First, during Plaintiff's hearing before the ALJ, Plaintiff agreed that he had an opportunity to review the record, had viewed all evidence that had been communicated, and had no objection as to any of the evidence in the record. (R. 33.) Second, in making his decision, the ALJ had two State medical consultants, two State agency psychologists, a psychological consultative examiner, an internal consultative examiner, and several functional capacity evaluations from treating physicians and physical therapists. (R. 65-66, 67-69, 78-79, 80-82, 303-305, 324, 346-347, 351-352, 355-357, 447-449, 452-457, 459-461.) As such, Plaintiff's argument is unavailing.

### F. The ALJ Properly Accepted the Vocational Expert's Testimony Regarding Available Jobs Plaintiff Would be Able to Perform

Plaintiff concludes his argument alleging that the ALJ accepted the Vocational Expert's ("VE") testimony without question. (dkt. 13 at 13.) Although Plaintiff does correctly state that ALJ's are warned against accepting VE testimony without question (*See*, *Voight v. Colvin*, 781 F. 3d 871 (7th Cir. 2014), Plaintiff has forfeited this argument by failing to object to the VE's testimony at the

hearing.[10] *Jeanette E. v. Berryhill*, 2019 WL 354950 at *19 (N.D. Ill. Jan. 29, 2019). Although plaintiff only now argues that the VE's source of estimates may not be accurate, when no one questions the VE's foundation or reasoning, "an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the [DOT's]…" (dkt. 13 at 14).[11] *Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002). Thus, the Court rejects this portion of Plaintiff's argument.

In sum, Plaintiff's arguments regarding the symptom evaluation are either incorrect or misstated, and the Court believes Plaintiff's motion should be denied.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's Motion for Summary Judgment (dkt. 23) is granted and Plaintiff's motion (dkt. 12) is denied. The final decision of the Commissioner is affirmed.

Entered: September 11, 2019

_____

U.S. Magistrate Judge, Susan E. Cox

---

[10] After requesting where the VE received his information regarding employment numbers throughout the nation, Plaintiff's concluded his questioning with "That's all I have of Mr. Dunleavy." (R. 57.)

[11] Although Plaintiff now questions the legitimacy of the VE's testimony, during the hearing, the VE revealed that each estimate was from the Bureau of Labor Statistics determined by studies from the Census Bureau. (R. 56.)